We're going to hear two cases today. The first is Coleman v. North Carolina Department of Public Safety. So whenever you're ready, counsel. Good morning. May it please the Court. My name is Kramer Lewis, and I represent the plaintiff appellant in this case, the estate of Devante Coleman. There are two issues before the Court. One, whether the district court erred in granting summary judgment to all of the individual defendants on Devante's Eighth Amendment claim when material fact disputes remain with respect to the conditions of confinement that Devante was exposed to while he was in the hospital on his deathbed. And two, whether the district court erred in failing to consider or rule on the direct constitutional claim under the North Carolina Constitution that Devante's estate brought against NCDPS. Are you talking about the conversion and obstruction of justice claim that you're bringing? Yes, Your Honor. Where did you argue that below, the argument you're making here? We argued it in our brief below in the summary judgment brief. We also argued it at the hearing for summary judgment. And we argued it, we brought that claim in our complaint. And in the complaint, it was under Section 1, or Article 1, Section 27 of the North Carolina Constitution. So where is it in your complaint? What count? I'm not sure of the count off of the top of my head, but it's the North Carolina constitutional claim. Do you have the complaint anywhere with you today? Yes. So, I mean, I'll let Judge Harris finish, but maybe you can find that then when you get back up here. Go ahead. I mean, you do have the count for a North Carolina constitutional violation, but it is not about conversion or obstruction. It's about the deprivation of the necessities of life. It's basically the conditions of confinement claim. So I don't really see a claim for a North Carolina constitutional violation based on conversion or obstruction. So given that you're faulting the district court for not reaching this claim, I think it is only fair to point out it's not in your complaint. Yes, Your Honor. That is fair to point out. I would answer that our complaint has, again, that Article 1, Section 27 under the North Carolina Constitution and that the obstruction and the conversion claims are also in the complaint and it's all incorporated by reference. And then at summary judgment, we argued that to the extent that those claims can't go forward because of the function of sovereign immunity on its own, that under quorum we should be able to bring those claims directly against NCDPS. Are you saying that your obstruction and conversion claims are somewhere else in your complaint, separate from your complaint about Article 1, Section 27, and that we have to just read the whole thing and piece it together to find that claim in your complaint? Yes, Your Honor. To an extent, it's from the incorporation. With all of that effort, why isn't that argument waived if you have to jump, if the court, particularly the district court, would have had to jump through all the hurdles you just recounted in order to even find that claim? Because that was in our complaint, and then the facts developed throughout discovery. But then you're supposed to amend your complaint. I mean, we've said on several occasions you can't amend your complaint by arguing something new at summary judgment, and I'm bracketing whether this was argued at summary judgment, but, I mean, that's what amendments are for. Understood, Your Honors. If it's all right, I would turn to the Eighth Amendment claim. Please do. Yes. Devante was palpably deprived of his constitutional rights under the Eighth Amendment. Under the totality of the circumstances, he was deprived of identifiable human needs, and that led to a serious emotional injury or at least the substantial evidence of a possible emotional injury. And there are fact disputes kind of underlying. Well, what's your best authority to support that the totality of the circumstances here amounted to the level of extremeness required for an Eighth Amendment violation? Our best authority is Lafayette. But in terms of the question about what is the, how does the totality of the circumstances play in, I think it's really important to understand what are these circumstances, and they are that Devante was in the hospital during the summer of 2018. He's got this fatal, he's terminally ill with this rare fungal infection. It's caused his head to swell. He's kind of disfigured. His eye is swollen shut. He's got severe facial pain, headaches, nausea, kidney injuries, ultimately, and anemia. And under these circumstances, the argument is that when a prisoner is under these kind of circumstances, for the guards in his room to force him to urinate in a cup while he's still chained to the bed in front of his family, in front of mixed company guards, while there is a restroom just two to three feet away inside of this private room, it's a private restroom, that this deprives him of his basic human needs. And the way that it plays into Lafotte, in that case, that was out of North Carolina, I believe, in the 80s, and it's a federal bivens claim. And you've got a prisoner that's in a wheelchair who has to kind of undergo these sort of embarrassing procedures to use the restroom. And this goes on for a while, and the facilities there didn't quite meet his needs. And he's asking, hey, you know, can I have better facilities? And they're not really doing anything. And the court really found that he was particularly susceptible, right, to this embarrassing procedures to have to try to use the restroom. And they found that it was an Eighth Amendment violation, particularly under circumstances where there were practical solutions that were available, and they were ignored out of mere convenience or apathy. In this case, you've got almost really an even worse circumstance because these aren't facilities that are just bad. He's in a hospital, and there is access to a restroom right there. Where the kind of apathy or wanton infliction of pain comes in is he's asking, hey, you know, I'd like to urinate. Can I go to the restroom that's two to three feet away? And the response is no. You have to stay chained to the bed, and we'll hand you a cup, and you need to try to urinate in this cup despite the fact that, you know, your head's swollen. You're in all of this pain, undergoing all of this terminal illness. Oh, and your mom and dad are in the room, and there's female guards sometimes in the room and male guards. So to really bring Lafaut into this circumstance would be later on in Lafaut, they tried to fix a restroom by taking out a wall of a stall so that he could use it better under his circumstances. And the court explicitly said that that still doesn't really do it because he's now more exposed, and guards or not guards but other prisoners could see him undergoing those embarrassing procedures. To bring Lafaut to this case, you know, while he's in that stall, not just other prisoners, put his mom and dad in the room, put mixed company guards in the room while he's trying to undergo these procedures. And so that is where this kind of wantonness comes in, and that's also to the qualified immunity portion of it in addition to this objective severity. Lafaut, for those reasons, the reasoning of it as well as what the court really took issue with, should have put these guards on notice that what they were doing was wanton infliction of severe emotional pain. There's been this kind of question about, well, shouldn't we need expert testimony to demonstrate that this was a severe emotional injury? And I think that was kind of a clever framing of the issue below by the defendants, and I think the district court kind of latched on to this sort of straw man of, are you saying that he would have died less quickly had this not been done to him? And that's not the injury that we're alleging at all. We're alleging this humiliation and degrading sort of behavior that's being done to Devante by the guards while he's in the room, and that sort of injury, understanding that emotionally palpable injury, is in the purview of a jury. And this court has spoken twice on this issue, at least with respect to severity and expert testimony. This court has said in Jones and Cento that you don't need expert testimony for when an individual isn't given insulin or when they're having to come into contact with DCs. In addition to having to use the urinal in the hospital bed, weren't there other things adding to the totality of the circumstances, in your view, that create a Ninth Amendment violation? With respect to the totality of the circumstances, what Wilson tells us and other Supreme Court president tells us is it's kind of a funnel effect, right? It's not like you stack, stack, stack, stack, and eventually the dam breaks. You can have all these different kinds of circumstances, but they all have to go down to depriving someone of an identifiable human need. And below, yeah, we put in a lot of different circumstances, and I think that adds to kind of the emotional situation, right, where he's not able to go out. Would you like to recount those now, the other circumstances? I mean, it's the urinal. It's being handcuffed to the bed. It's the food situation. Yes, Your Honor. Lack of visitors. That's right. It's lack of visitors. It's not being able to go outside. It's not being able to use the restroom when he's asking to, and it's available there for him. It is his family not being able to kind of hold his hand or anything whenever he is going through this terminal illness. But the way that if we're looking at the case law, I think the way that everything goes down to depriving him of an identifiable— Do you know if he had been in a prison hospital setting, like at Butner or somewhere, would he have been able to have visitors and have people hold his hand and all of that stuff or no? Your Honor, I do not know, but I do know that it's not a constitutional violation to deny visitors, which is why I want to focus on the circumstances of he is terminally ill and the combination of that circumstance with him asking, hey, I need to urinate. Can I go to the restroom? And them saying, no, you need to urinate in this humiliating way. That is the clear identifiable human need that the circumstances combine to deprive him of in that sort of funnel fashion. You talked about the district court making certain findings of fact or not making inferences in your favor. Do you want to give us an example of that? Yes. With respect to the food being taken away, if he can't eat it quickly enough while he's chained to the bed and undergoing this illness, Derek Coleman testified that this was happening at least once a week when he's in the room and seeing his son. The district court took that as the kind of top and all that could have been inferred. They stopped the inference there. All that could be happening is he's losing this food at most once a week. If you're taking the inference in the light most favorable to the non-movement, Devante, that is not where the inference stops. It's where it starts. The inference is not that they're doing less things that are humiliating and degrading and hurting Devante when his dad's not there, but that they're doing more and that the father's not necessarily seeing all of it. With respect to the urination, several guards testified. The guards who were identified in affidavits and in testimony by the Coleman's who were supposed to be doing this bathroom deprivation, those folks, several of them denied outright that they had done it. One just failed, didn't deny it. Another said that, well, yeah, maybe I could have done it. To that point, the one that said she could have, she kind of contradicted and went back and forth and said, hey, that would be inappropriate to do, which one shows subjectively she was aware that this was bad. We have this fact dispute as to what even happened in the room, and it's kind of just being glossed over or resolved with respect to the urination. Can I ask you a question? The district court found that a lot of this was a matter of policy. I can't remember the name of the entity, but the entity has these policies. The guards are following the policies. If that is right, doesn't it become difficult to argue that the individual guards had the requisite sort of deliberate indifference if they're following policy? Yes, Your Honor, and that is a really great question. I'm very glad you asked it. There is an underlying fact dispute as to what the policy is with the urinating while chained to the bed, even though there's a bathroom right there. The warden at the time, Thomas, was deposed, and he said, if I knew this was going on, I would investigate it and try to take corrective action. The guards were variously saying, no, this is up to our discretion. It's pretty much saying there's not a policy that we're following on this. I see that my time is up now, so I will just conclude that we'd ask that the court reverse and remand with respect to the Eighth Amendment claim. All right. Thank you, Mr. Lewis, and you have some time in rebuttal as well. Mr. Williams?  Hey, police court, my name is Alex Williams, and I represent the defendant appellees. It is tragic. The plaintiff contracted this infection, and he subsequently passed away. But we're not here about how he got sick or what kind of medical treatment he got. Ultimately, this is a conditions of confinement case, and I call it with a tag-along, and that tag-along being a state constitutional claim. Plaintiff cannot satisfy either claim. Well, did plaintiff waive the obstruction and conversion? No, I believe he did, yes. The answer is yes. And so he did not appeal the dismissal of there were separate claims for obstruction of justice and conversion. He did not appeal either one of those. What he's trying to do is now morph this state constitutional claim that was previously based on conditions of confinement into a newly alleged conversion or obstruction of justice claim. And the case law is very clear that you're not allowed to switch horses midstream like that. And so I do not believe that plaintiff has that claim available to him right now. As Your Honor mentioned, Judge Harris, he should have amended his complaint to have included that, if that's what he wanted to argue. The case law is very clear that you're not allowed to amend during summary judgment briefing or summary judgment oral argument, and that's effectively what he's trying to do. Counsel, before we leave obstruction, I mean, what on earth happened? All the shift records just go missing? Like the exact records the plaintiff would need to kind of prove subjective intent on the part of individual officers, they all disappear in the middle of the litigation? I mean, have you guys figured out what went wrong? So, first off, let me correct part of that. Not all of them went missing. But many, many days' worth. Yes, many, many days' worth did. And separate. But there wasn't just one set of records. It's two set of records for the same days, and those records were all kept in different locations, right? I don't know that they were ultimately kept in different locations. They would have started at the hospital, the hospital logs, and then they would have made their way back to central prison where they would have been kept, probably in the same area as the shift narratives. But there are the shift narratives and the hospital logs, and both went missing for the same number of days. So, it looked like there were two sets of logs that were then missing. I don't dispute that there are two sets of logs. I'd have to go back and compare whether they're the exact same days that went missing. There might have been some overlap, but I don't think that if they're being kept in the same place at central prison, that actually kind of makes sense to me, that if you start missing one set and they're kept in the same place, you're probably going to be missing the same set. These are paper records? Yes, Your Honor. Okay. Yes, they are. So, what happened? Why? I mean, is there some explanation? I mean, I find it alarming. I don't know why the district court would not have made an adverse inference against your client, given the lack of these records, and why would that have not been appropriate? Your Honor, for a few reasons. Number one, I think for any adverse inference, you have to show some sort of intent. And that's the exact problem that the district court had with these two claims. Number one, these are distinct claims that he alleged, I believe, in counts six and seven, versus his state constitutional claim is a distinct other claim that he's alleging, I think, in count five or something like that. And when the district court looked at this, it said, hey, you've got to show intent to satisfy these claims. But even if you're talking about an adverse inference, you would still have to show intent. And he cannot pinpoint who had these records, what happened to these records. There's nothing that can be tied down for what happened to these records. How is he supposed to be able to do that? He's busy dying, chained to his hospital bed when all the records go missing. And you couldn't pinpoint it a few minutes ago when Judge Haynes was asking you about it. How is he supposed to figure it out? Your Honor, I think he had months upon months during discovery to try to pin this down, and he did. And he had all these depositions. And the warden and everybody else said, hey, I don't know what happened to these records. I wish we had them too. But the records that even we did produce, plaintiffs still did not make use of those records. And what I mean by that is there were shift narratives. There were hospital logs that we produced. And there were a lot more guards that were taking care of Devante. Those guards were not named in this lawsuit. So even the records that we did produce, he didn't take advantage of them. And the records that we did produce show that we're not depriving him of any basic human needs. They show that he was getting up and walking. They show that his urinal was being emptied. They show that he was actually getting up and using the restroom. They show that he's getting this medical care. This is not the level of an— So he wasn't required to use the urinal all the time? No, Your Honor. The hospital logs show that he was allowed to get up and use the restroom. And so when I look at this case and I look at this case through an Eighth Amendment lens, we have to see an extreme deprivation. He's being kept at two of North Carolina's best hospitals. How can we have an extreme deprivation when he is at Duke University's hospital, one of the best in the country, and a hospital, Rex Hospital, which is part of the UNC healthcare system? But that's not their claim. Their claim isn't related to the medical care that he received. Their claim is related to the treatment he received at the hands of the guards, irrespective of the medical care he received. Yes, but I still just find it hard to believe that you're going to have that extreme deprivation in this hospital setting. Because what we ultimately see, and we don't see an extreme deprivation, because what we ultimately see is he's complaining about having to use a urinal. He's not saying he didn't get to go to the bathroom. He's not saying he didn't get to relieve his bodily functions. He's just saying he didn't get to do it in the way that he wanted to do it. He's not saying he didn't get food. In fact, the hospital records show that he was getting food. The medical records actually show that he didn't want food. He had a lack of appetite. And lastly, the hospital records and the hospital logs, they were showing that he was sleeping. So he's not getting that deprivation of rest. He may not be getting the rest that he wanted at the times that he wanted, but that is nothing more than routine discomfort. And the Supreme Court has— Isn't there a medical facility at Butner in North Carolina? That is a federal facility, but yes, Your Honor, there is. And there's also a—within the North Carolina prison system, central prison has a medical facility. All right. But in these contexts, he's not having these Eighth Amendment violations. He's getting food. He's getting rest. He's getting to relieve his bodily functions. He's just not able to do it in his desired manner. And that's what this whole lawsuit is about, is he forgets that he was still a prisoner. And if he—and that's sort of my point. If he had been in one of the state prison medical facilities, people couldn't have brought him food from the outside, and he would have been still in a confined—he would have been— or maybe he wouldn't have needed to be handcuffed because he would have been in a prison facility. So it might have been worse had he been in a prison facility than being at Duke. That's correct, Your Honor. Arguably, I think it would have been worse. I mean, let's be honest. Rex Hospital probably has—I've been to Rex Hospital. I've had their food. I can tell you their food is probably way better than prison food. And so he was getting some sort of a benefit in being at the hospital. There were certain things that he probably would not have gotten had he been at one of these prison medical facilities. So we just don't see this level of deprivation under the Eighth Amendment that he talks about. So I don't think that he could satisfy the objective requirement under an Eighth Amendment claim for those reasons. But then— Can I ask a question before you move on to that? Yes. There are a couple instances in which the district court and plaintiff cites one in which regarding, you know, the father testifying about finishing meals and he was only there once a week. And so the inference that the district court made was that it could have only occurred at most once a week. That seems to me to be an improper inference. It should have gone the other way, that if he saw that every time that he was there, the dad, then the inference should have been that when he wasn't there, that was the same thing that was occurring. Do you—I mean, do you think that that's a proper inference that the district court made in that instance? I don't think that's proper when we also consider the medical records that were submitted. Because the medical records and the hospital logs that we did submit show that he was getting these meals. They mention nothing about him not getting the nourishment that he needed. And I think ultimately, let's say even if we draw that inference, let's say his meals were rushed every single time, we still do not know the duration that he's talking about for the rushing. Does he consider an hour to be rushed? Is 10 minutes rushed? We don't know that because he didn't testify to any of that. And so he's just saying that there were these rushed meals. But we don't know the extent and the frequency of it because he didn't—there's no evidence to it. Quite frankly, the evidence is in our favor that shows that the medical records show he didn't want to eat. He had a lack of appetite because of his condition. But that he was given food and that they were encouraging him to take food. The hospital logs show when the food was taken, when the food arrived, and it shows that it arrived every single day. But again, I hate to keep coming back to this, but I'm not— relying on the hospital logs we have when some of them have gone missing makes me a little uncomfortable. Do you see why this is somewhat concerning? I'm not saying this happened, but for all we know, someone pulled out the bad days, those are the ones that are missing, and left us with the good days. So how much can we rely on a set of records that is incomplete, and it's incomplete because of something that happened at the state's hands? Well, I think when we're talking about drawing inferences in the light most favorable to the plaintiff, which is what Judge Haynes had asked about, I think you have to consider the evidence that is there. And I think you do have some evidence— It's like a curated set of hospital records. I'm not— The hospital logs, Your Honor, they may be missing and they may be incomplete. The medical records are not. Those are complete. And the medical records do show that he was receiving food. He was being encouraged to eat food, but that he had a lack of appetite. And so I don't think— What did you say was incomplete? I'm sorry. The hospital logs are different than the medical records, and so the hospital logs are the prison-created logs by the guards, wherein the medical records would have been by nurses or doctors or whoever. And so the medical records actually show that he was receiving food, but that he had a lack of appetite and that he didn't want to eat. And so I still don't think, even if we take that inference and we construe it in the light most favorable to the plaintiff and say that his meals were, quote-unquote, rushed, we still don't know what that means. And we still don't know whether that's five minutes, 15 minutes, 30 minutes, an hour. The simple fact of the matter is the plaintiff failed to satisfy that element to show that it was an extreme deprivation, which is what's required. And so I still don't think he can satisfy that objective element under any standard here. But then, even if he could satisfy that, he still cannot satisfy the subjective element. Because, again, he cannot identify which guard did which action. And that's because the logs are missing, in part. The logs do show, don't they, which the hospital logs, which guard was there? That's correct, Your Honor. They would. And even the logs that we produced, they didn't make any use of them. And Devante's parents were there. They witnessed the individuals who were doing this. The individuals have a name tag on their chest. They didn't take down any information. They didn't do anything. The parents might have been somewhat distracted, right, because they had to tend to their dying son. So maybe they weren't, like, busy writing down names. Quite the contrary. In this case, I think that's quite the contrary because they quickly hired an attorney. Their attorney was actively working while Devante was still in the hospital. They knew that they needed to be maintaining these things. They took the steps to maintain those things. They just didn't maintain those names. And I think that in this particular case, Mr. DeVore, their attorney who's sitting right behind me, he was there. I don't remember exactly at what time period, but months before Devante died, Mr. DeVore was there. And they should have known that they need to know each individual who was doing these things. But in discovery, they asked you for the names. And my review of the records suggests that you all didn't initially, you resisted providing them the names until their client sat down and looked at the videos and put names and faces together. I mean, when they initially served the preservation request and asked for the names, you didn't turn over records until the lawsuit was filed, until discovery was requested, right? There was delay? You're right in the records were not produced until the lawsuit was filed. I don't think that, I think these records are confidential under North Carolina law. So I don't think they were entitled to them until the point of a lawsuit being filed and discovery request being served. And so we did produce what we had at that point in time. Why wouldn't all the guards been, you could have looked at the list of the guards and they should have all been listed in your disclosures as individuals with possible information. Why weren't the guards listed right from the outset and every guard that interacted with them listed in your initial disclosures? Your Honor, I don't know that they weren't. A lot of times, well, I don't know the answer to that because I don't have the initial disclosures in front of me. I wasn't involved when the initial disclosures were done. But I don't know that they weren't. You know, a lot of times what we do is we identify individuals saying, hey, we're producing to you these documents. We're going to identify the individuals produced within these documents or identified within these documents. And so I still think that through discovery, the documents that we did produce to them, they still did not utilize. There are multiple guards that were not named as a defendant in this lawsuit. And they had them. They had the hospital records to show that they were the ones that were actively taking care of Devante. And they didn't do anything about it. They just kind of haphazardly named a bunch of guards. And they cannot tell you which one did each thing. And so I don't think that they can satisfy this objective element because they can't show that these guards had that required knowledge that it was being a constitutional violation. Can I ask you a question about that? The district court seems to have reason that if the defendants are following department policy, then they can't be deliberately indifferent. And why is that so? I mean, I would think that you could have a department policy that is, you know, perfectly fine in the vast run of cases. But you could still know that in a particular application, it's causing a risk of serious harm. Your Honor, I think that the guards, I think rightfully so, operate with the idea that these policies are put in place not only for the guards' protection, but also for the inmates' protection a lot of times. And so I think by following those policies, I think that the guards had a reasonable expectation that there was no risk of harm to Devante. And when we look at this and what I heard plaintiffs say, they're really focused on, they've kind of abandoned a lot of this as far as the policies go. They seem to only be focusing, I think I heard him say that they're focusing on the humiliation associated with the urinal. And that seems to be the focus of what their argument is today. With that particular policy in mind, the testimony, if I remember it correctly, was that it depended on how many guards were present and how many inmates were present at the hospital. And that the idea was that they wanted there to be two guards present when an inmate is released from his shackles and allowed to get up out of his bed and go somewhere else. And so the evidence, I think, if I remember correctly, said that there were times where Devante didn't, he didn't want to get up. And that makes sense. He's really, really sick. That is consistent with a lot of other hospital patients. They don't want to get up. They choose voluntarily to use that urinal. But there were probably other times where maybe he did want to get up, but there was only one guard present. And so they said that they would have to wait for that second guard to get up. Would you like to respond to opposing counsel's argument that our LaFont opinion supports his argument? Your Honor, I don't. I think LaFont is very, very different. LaFont, I think, was in a prison context, not in a hospital context. Number one, LaFont, I think, involved a very different situation with an inmate. That particular inmate, they did not have a toilet that would satisfy that particular inmate, and they ended up using catheters. But in that particular case, if I remember correctly, the court said it was okay to do the catheter until they could figure out a better situation for him. Other courts have similarly said that catheters and urinals are not constitutional violations. And so I don't think that LaFont gets him to where he wants to go. And I don't think it is as strong for him as he thinks it is. And what you ultimately have here is an inmate who I think the other difference between LaFont and this is a catheter is a much more evasive method than using a medical urinal, a urinal that's being emptied by medical professionals. And so I think that there is a difference there as well. The last thing I will say, Your Honor, is even if we get to the point of you saying, yes, it was a constitutional violation the way that they treated him while he was in the hospital, it was not clearly established. And I think that these individual guards would be entitled to qualified immunity because it was not clearly established. And specifically, with this combination of factors, given all the other cases out there, that I understand that we really need to look just to the Supreme Court and the Fourth Circuit. And in that context, there were not cases that talk about the use of a urinal. There were not cases that talk about a loud TV. There were not cases that talk about how quickly an inmate can be forced to eat his meals and things like that. And even when you take all those separately but then combine them, I still don't think that it was clearly established. All right. Thank you. Thank you. Mr. Lewis. Judge Harris, I think you made a really salient point about the curated set of logs. I think it's really important when we're thinking about these inferences that happened in the district court to remember, yes, I mean that's a curated set of logs. In early July, NCDBS had noticed that these things were going on. Those early July dates all predate the creation of the logs that we don't have. And according to what was agreed to in discovery, that's at least 15 days. If you look in the record and you see how many logs there really are, there's really more. For those 15 days, are there medical records from the hospital? The medical records that we have from the hospital, there may be. I'm not sure if they match up directly. But they're not really the same thing. These medical professionals are kind of coming in and out. They're worried about trying to fix this complicated issue that's going on with him. The guards are with him all the time. And when it comes to thinking about, well, is this curated? I would think the medical professionals would also be worried about whether he's getting the proper nutrition, whether he's being taken care of, that sort of thing, that would be reflected, as opposing counsel said, in the medical records, correct? Correct, if they know about it, if they know what's going on. And they may not know all of these things, particularly when opposing counsel was framing the urination issue. He said he didn't get to use the restroom in the way that he wanted to. That's not really, I think, a really fair way to look at it. The issue is whether or not it was a wanton infliction of pain to try to degrade and humiliate him when his family's there and when mixed company guards are there, when he's asking, can I just use this restroom that's right here, and they're saying, no, you can urinate in this cup in front of everyone. Let me ask, I guess on these records, did you, you know, one of the things the district court said is that you didn't establish who was responsible for maintaining them. So in discovery, did you ask them, you know, who's responsible for retaining these? Who do I talk to? Who's the custodian? And if you didn't get those, then did you file a motion to compel? Like it's just very concerning to me why this issue wasn't presented to the district court in a way that he could have dealt with. Yes, we did ask everyone. We took about 15 depositions, including some 30B6 depositions, and asked, well, who would be responsible for this? Everyone said, well, I don't know. That wouldn't be me, and I couldn't tell you who. What, even the 30B6 person couldn't answer that question? No, and to be fair, I don't know exactly what the 30B6 categories were. But included in all of this, we're asking everyone, including policymakers, wardens. So then did you file a motion to compel? I believe we came right up to it. I don't know. So that's a no? I'm not sure if it got filed. I don't want to answer yes if we didn't. When it comes to, okay, then we're just apparently naming people willy-nilly, and we don't know who's who, we actually painstakingly tried to help show our clients what's going on and allow them to try to remember this is like four years later. But they actually were able to specifically remember some guards, and I think it's really important to say that when it comes to the objective level and when it comes to the subjective as well as qualified immunity. I mean, when it comes to the urination, they specifically identified McLam, Burt, Oliver, Royal, Ward, Diggs, and Salas. Those guards variously denied or equivocated on whether they did that or not. It was brought up as to whether those guards were just kind of doing this when there was only one guard in the room, if they had a reason to do it. There's no guard that testified, yeah, that's when I did it with Devante. Sometimes I'd only have one guard in the room, so that's what I did. A lot of them, most of them, all but one, just denied it. Another guard said that it would be inappropriate to behave like that. So that's not in the record. There's suggestion of maybe that would happen in hypothetical ways, but nobody is saying, yeah, when Devante needed to urinate and his family was in the room and two guards were in the room or there was just one guard in the room, and so that's why I had to do it. I did it that way. I'm following policy. That's not in there in terms of a guard on their actual knowledge of what happened saying that. To all that extent, you know, under Peltzer and under LaForte, qualified immunity is all about notice, and these folks had noticed that what they were doing was inappropriate. Even some of them testified that that would be inappropriate. So I see my time is up, and we respectfully ask this court to reverse the Eighth Amendment claim and remand it to the district court. All right. Thank you. We'll come down and greet counsel and go to our next argument.
judges: Stephanie D. Thacker, Pamela A. Harris, Elizabeth W. Hanes